Hall v. Goodnight.

---

HALL et al., *Appellants*, v. GOODNIGHT.

Division One, April 3, 1897. *

1. **Insolvent Corporation**: MANAGING OFFICER: PRIVATE DEBTS OF: FRAUDULENT TRANSFER. A managing officer of an insolvent corporation can not lawfully make a voluntary transfer of the corporation property or pay his private debt therewith. If he does such an act, it is presumptively fraudulent as to creditors of the corporation who object.

2. ———: ———: ———. The private debt (in question in this case) arose from a sale of goods afterward transferred by the purchaser to the corporation in exchange for its stock; such debt was held to constitute no liability of the corporation.

*NOTE.—Decided December 1, 1896. Motion for rehearing filed, but withdrawn April 3, 1897.

3. ———: FRAUDULENT CONVEYANCE: INNOCENT PURCHASER. The statute of fraudulent conveyances (R. S. 1889, sec. 5170) condemns all transfers of property with intent to hinder or defraud creditors. Every rational man is presumed to intend the natural and probable consequences of his acts. So where one buys goods of a corporation and pays by surrender of a personal debt of its manager, the purchaser is chargeable with the intent to remove such property from reach of the creditors, and that intent is presumptively fraudulent as to them. The fact that the purchaser of the goods is unaware of the insolvency of the company does not make the act innocent as to creditors of the corporation.

4. ———: ———: ATTACHMENT. Property of a corporation, obtained with the intent above described, may be reached by attachment at the hands of creditors of the corporation.

5. Individual Liability: CORPORATE ASSETS. An individual may, in some circumstances, become equitably liable for the debts of a corporation by reason of his attitude toward it, but one who has put his business venture into the form of a corporation may not prevent the creditors of the corporation from insisting on payment from the corporate assets.

6. ———: PREFERENCE. A corporation, thought insolvent, may execute an honest preference in favor of one of its creditors to the exclusion of others.

7. Partnership: ———: KNOWLEDGE. Members of a partnership are chargeable with the knowledge of one of the members by whom a purchase of goods for the firm was made.

8. Appellate Practice: Parties are bound on appeal by the positions they have taken in the trial court. So where a stipulation of counsel recited that writs of attachment were in due and usual form, and the case was tried without any objection that the levies under the writs had no legal foundation, it will be too late to raise that objection on appeal.

9. ———: HARMLESS ERROR. A party can not on appeal secure a reversal for an error which was not prejudicial to his substantial rights on the merits.

*Appeal from Jasper Circuit Court.*—HON. W. M. ROBINSON, Judge.

AFFIRMED.

*George Hubbert,* with *J. A. Rice* and *H. C. Pepper,* for appellants.

(1) It is well settled law that if a part of the consideration for a conveyance is fraudulent or fictitious

as to creditors, the entire transaction will be vitiated. *National Tube Works v. Ring Ref. & Ice Co.*, 118 Mo. 365. (2) The Chamberlain company was a good and sufficient concern and had the right to sell the goods in controversy to appellants free from any creditor's claim or equitable trust. *Graham v. Railroad*, 102 U. S. 158; *Manhattan Brass Co. v. Webster, etc., Co.*, 37 Mo. App. 145; *Hospes v. Neff Co.*, 50 N. W. Rep. 1119; *Alberger v. Bank*, 27 S. W. Rep. 657; *Hollis v. Co.*, 150 U. S. 371. (3) In identity of principle, as above suggested, stand the powers of an associated co-partnership concern and of a corporation over its property, which a partnership holds also in trust for its creditors in a like sense as in the case of corporations. So, if it be suggested that here the corporation really but improperly turned its property over as a consideration for the surrender of a debt primarily that of its stock owner, it may not be amiss to show at this point that if the owners of the property, that is to say, the beneficial proprietors, whether share owners or partners—if they stand consenting, no creditor can at all question such a trade, unless it be also intentionally fraudulent as against him. *Duhring v. Duhring*, 20 Mo. 174; *Matthews v. Hunter*, 67 Mo. 293; *Julian v. Wrightsman*, 73 Mo. 569; *Sexton v. Anderson*, 95 Mo. 373; *Reyburn v. Mitchell*, 106 Mo. 365. (4) There is no allegation in the answer to stamp the property of Chamberlain & Company with a trust in favor of attaching or other creditors. It would seem clear that there is no remedy available to defendant, under the law, for the return of any part of the property or its value, under the pleadings. *Northrup v. Miss., etc., Ins. Co.*, 47 Mo. 435; *Kersey v. Garton*, 77 Mo. 645; *Reed v. Bott*, 100 Mo. 62. (5) Whatever may be supposed as to the rights of the creditors of the Chamberlain company to follow the proceeds of the property in

question as a trust fund for their benefit, the remedy therefor is not available through respondent or in this case, nor otherwise than through an equitable administration of the trust, if there be one. *Walker v. Miller*, 59 Fed. Rep. 869; *Foster v. Mullanphy, etc.*, 92 Mo. 79. (6) The suggestion that the transaction in question, so far as it involved the acceptance of the Chamberlain-Terry note for $3,500, in part payment for the goods, was a misapplication of the corporate property to the payment of a purely private debt of one of the corporators, must, from an equitable point of view, be deemed without foundation in the facts of the case, under the law as applied to similar cases, as an examination of the authorities will show. *Manhattan Brass Co., supra; Swift v. Smith*, 65 Md. 428; *Bundy v. Iron Co.*, 38 Ohio St. 300; *People v. North River, etc.*, 121 N. Y. 582. (7) Chamberlain, as president and manager of his company, had Anthony to sell to appellants the entire Exeter stock of goods. *Chouteau Ins. Co. v. Holmes*, 68 Mo. 601; 17 Am. and Eng. Ency. Law, pp. 126, 127. (8) Even supposing Chamberlain to have exceeded previous authority in negotiating a sale to Hall & Company, the evidence here shows such approval of that act by the nominal directors of the company, to bind the corporation; and beyond even that, we have such evidence of the acquiescence of all the stockholders as makes the sale the binding act of the corporation under the law beyond any reasonable question. R. S. 1889, secs. 2511 and 2772; *Bank v. Rutland Co.*, 30 Vt. 159; *Bradstreet v. Bank*, 42 Vt. 128; *Samuel v. Holladay*, 1 Woolworth C. C. Rep. 400; *Bonellis Tel. Co. Case*, 12 Eq. Cases, 246; Cook on Stockholders, sec. 729, note 4. "A stockholder's right to object to a director's acts can be exercised by him also. *Ib.*, sec. 733. (9) The judgment must be reversed for the reason that it was incumbent on him

to show such facts as authorized the issuance of the attachment. *Kendall v. Bain*, 46 Mo. App. 581; *Oberfelder v. Kavanaugh*, 21 Neb. 483; *Williams v. Elkenberry*, 25 Neb. 721; *Thornburgh v. Hand*, 7 Cal. 554; *Mathews v. Densmore*, 43 Mich. 461; Wade on Attachment, sec. 33.

*Sebree & Tatlow, Cloud & Davis* and *Rathburn* for respondent.

(1) An insolvent corporation can not appropriate its assets to the payment of the individual debts of one of its officers. *National Tube Works Co. v. Machine Co.*, 118 Mo. 365. (2) The judgment should not be reversed because the sheriff did not offer in evidence the petitions, bonds and affidavits in the different attachment suits under which he held the goods in controversy. *First.* On the trial appellant admitted the writs were issued in the usual form and in favor of the creditors of the Chamberlain Mercantile Company for the amount specified in the writs. *Second.* Because the defect now urged was at no time called to the attention of the trial court. The appellate courts of this State will not permit a party after an appeal to raise questions and assign errors which were not specifically called to the attention of the trial court and an opportunity given to pass upon such questions. *Brown v. Foster*, 112 Mo. 297; *Griffith v. Hanks*, 91 Mo. 109. (3) Our statute requires that before a writ of attachment can be issued from the circuit court there must be filed in such court a petition, affidavit and bond. Here it is admitted that the eight writs of attachment, under which the sheriff held the goods, were issued in due form from the circuit court of Barry county and delivered to the sheriff, and the decisions are numerous that in the absence of a positive showing to the contrary, the law presumes

that all the officers have done their duty, and that all the prerequisities have been complied with in the issuance of such writs. *Hammond v. Gordon,* 93 Mo. 223; *Blodgett v. Perry,* 97 Mo. 263, at page 272; *Adams v. Cowles,* 95 Mo. 509; 1 Greenleaf on Ev., page 53, note a, at bottom of page.

BARCLAY, J.—The plaintiffs are Messrs. Hall and Terry. The defendant is Mr. Goodnight, as sheriff of Barry county. The action is a statutory replevin for a large amount of merchandise. Defendant had possession of the property under levies of various attachment writs against the "Chamberlain Mercantile and Land Company," which we shall call the "company," for the purposes of this hearing.

The plaintiffs got the goods, May 18, 1892, under an order of delivery in this action, in the usual way, upon a petition claiming title. The defendant justified his claim to possession by the attachment writs which he described in his answer. The eight writs were issued in actions brought by various creditors of the company to the amount of $7,560. The value of the property seized by defendant, May 16, 1892, under the writs was alleged by him also to be $7,560. (The plaintiffs in their statement of claim had alleged the value of the goods sought to be recovered by them at $6,500.) Defendant further demanded, by his answer, return of the property. To the answer plaintiffs replied by general denial.

The cause was tried with the aid of a jury and resulted in a finding for defendant for a proportional part of the goods, and that his interest in said goods was of the value of $4,294.

It was stipulated at the trial that the property was worth $7,560 when the action was brought, and that

the total claims of the attaching creditors were $7,526.28.

Plaintiffs appealed, after taking the necessary steps.

The plaintiffs' case was rested upon a purchase of the goods by Hall and Terry from the company.

The defense of the sheriff was that the said purchase was fraudulent as to the creditors, whose attachments he represented.

From the statement by the learned counsel for plaintiffs in this court we gather these facts.

The stock of merchandise in question, before plaintiffs' purchase, belonged to the company, which had been carrying on business at two stores, one at Exeter and the other at Cassville, in Barry county. The contents of the Exeter store are the subject of the pending action.

Plaintiffs purchased the disputed property, May 2, 1892, for the total invoice cost price of the goods, amounting to $8,100. They paid that sum thus: checks and cash to the amount of $3,806, and the balance ($4,294) by surrendering an old note made by Mr. C. W. Chamberlain, president of the company, which note Mr. Terry, one of the plaintiff firm, owned at that time.

The history of the note is in brief this: Mr. Terry and Mr. Chamberlain had been in former years partners in the Exeter store, but upon dissolution of the firm, in March, 1880, Mr. C. had given a note in payment for Mr. T.'s interest in the stock, Mr. C. continuing the business. The debt thus created was represented by a renewal note, which was the one surrendered at the purchase of the goods by Hall and Terry. The note was dated, July 1, 1883, for $3,500, with ten per cent interest from date. It was payable to the order of Mr. Terry, and signed by Mr. Chamberlain. A number of interest payments were indorsed thereon, down to December 18, 1891.

When Hall and Terry bought the Exeter store of the Chamberlain Company in May, 1892, Mr. Chamberlain, the president, acted on behalf of the company in the transaction. The company at that time was really insolvent, having less than half of sufficient assets to pay its debts, though it was still a going concern. Mr. Chamberlain testified that he then hoped to tide over the embarrassments of the company and to maintain its business. The company did in fact continue operations for a short time—several weeks. The money received by it from Hall & Terry went into the usual channels, and was disbursed with other funds to the total amount of $13,000 to various creditors, before the attachments that brought on this litigation.

After Mr. Chamberlain bought Mr. Terry's interest in the Exeter store, the former prosecuted the business for awhile as "Chamberlain Brothers;" but in 1889 he organized the company that made the disputed sale to plaintiffs.

The plaintiffs have mentioned certain other facts which they deem important touching the company so formed:

Mr. Chamberlain was the sole beneficial owner of the capital stock of the company, and gave the original note to Terry as purchase money for the stock of goods at Exeter, which was the basis of his business for a time before (as well as after) the incorporation of the concern under the laws of Missouri for his own benefit. He kept up the company's organization by making his clerks and employes nominal stockholders of a share each, and from time to time (through the years, from its date) paid interest on the debt out of the proceeds of that same stock. He intended the note should be satisfied out of the assets of the concern, and Terry was consulted (as one having an equitable interest in the matter) about the incorporation, at the time, and con-

sented to that move.    Chamberlain controlled the whole business.    There was a by-law of the company giving him full power of management.    The other holders of stock always obeyed his wishes and approved his acts in all things, and did so expressly as to the making of the sale to Hall & Terry in dispute here.

Instructions were given by the court, some of which are questioned; but it will not be necessary to mention them more particularly in view of the rules of law which we think control the result upon the facts which plaintiffs concede to exist.

1.    That a corporation may execute an honest preference in favor of one creditor, to the exclusion of others, seems to be fairly well established now by a number of decisions in the Supreme Court, of which we cite a few.    *Foster v. Mill Co.* (1887) 92 Mo. 87 (4 S. W. Rep. 260); *Meyer v. Folding Chair Co.* (1895) 130 Mo. 188 (32 S. W. Rep. 300); *Schufeldt v. Smith* (1895) 131 Mo. 280 (29 L. R. A. 830, 31 S. W. Rep. 1039).

2.    But it is also well established that, when a corporation has reached a point where its assets are insufficient to satisfy its corporate debts, a managing officer thereof can not lawfully pay his private debt from the assets, as against the rights of existing creditors of the company, who complain.    As to them such a transaction is inferentially fraudulent, at least.    It is no different in principle from a voluntary transfer of such assets, if unexplained.    *National Tube Works Co. v. Machine Co.* (1893) 118 Mo. 365 (22 S. W. Rep. 947).

The debt due Mr. Chamberlain to Mr. Terry (being merely an individual debt for which the company was at no time either morally or legally bound) could not be paid from the assets of the corporation, even by consent of all the stockholders, without committing a fraud on the then creditors, in the circumstances disclosed.

3.  The plaintiffs seek to parry the force of the foregoing proposition by the contention that the note represented the purchase price of the stock of merchandise, and that the assets of the company were, therefore, still equitably bound to respond to that obligation.  But that contention amounts to little in view of the testimony in regard to the organization of the Chamberlain company in 1889.  It is clear that the stock of goods was turned over to that company by Mr. Chamberlain for the shares of capital stock of the company which he received.  Furthermore, we mark the following passage in Mr. Chamberlain's testimony:  "At the incorporation we valued the lands and goods at $12,000, with $3,000 against it (*not including this indebtedness to Terry*) of merchandise bills; the stock being about $6,000 and the land as much more." The debt of Chamberlain to Terry (on the former partnership account) was clearly not then treated as a debt of the company, nor do any steps in the company's action indicate that the debt ever afterwards became one of the company.  The merchandise was paid for (as between Chamberlain and the company) by its issue of capital stock to him, or by the proceeds arising from the capital stock.  There is no law or equity to sanction the paying for it again by the company, in the manner which plaintiffs' argument seeks to justify.

4.  Plaintiffs further insist that the company was in fact a "one-man" company, and that Chamberlain was the one man.  Hence it is argued that the business was really his, and he could properly apply its resources to his old debt (arising therein prior to the incorporation) at least with the concurrence of all the other stockholders.  There are circumstances, no doubt, in which it has been ruled that an individual may be equitably held as the responsible debtor, notwithstand-

ing the existence of a mere formal pretense of a corporation. *Broderip v. Salomon* (1895) 2 Ch. Div. 323. But it is somewhat out of the ordinary that the principle of such a ruling should be sought to be applied as plaintiffs now suggest. The argument on that point is a brilliant exhibition of the ingenuity and resourcefulness of the learned counsel for plaintiffs; but it has not convinced us of its soundness.

The parties who complain of the act of the president of the company are creditors of the corporation itself. As such they have a right to proceed against the corporation to obtain satisfaction of their claims. If Mr. Chamberlain has cast himself into the legal form of a corporation, and outsiders have given credit to him in that form, he, at least, will not be permitted to shuffle it off so long as the demands of such creditors remain unpaid.

5. It is then insisted that if the attaching creditors have rights growing out of the use of the Chamberlain note by Terry in the purchase aforesaid, they are not such as can be made available except by bill in equity, etc.

The Missouri statute of fraudulent conveyances condemns all transfers made "with the intent to hinder, delay or defraud creditors of their lawful actions," etc. R. S. 1889, sec. 5170. The statute affects the rights of all persons who may engage in those transactions and who share in such intent therein.

Every rational man is presumed to intend the natural and probable consequences of his acts. So where a person obtains (as did Mr. Terry in this case) the goods of a corporation, in return for a note of a managing officer given for a private debt of his own, it may fairly be inferred that he intends to withdraw those goods from reach of the creditors of the corpora-

tion, who have a right to resort to them for the payment of their demands, in event of its insolvency. That act unlawfully and necessarily hinders or delays them, and as such it is *prima facie* fraudulent.

The personal and actual intent of the purchaser may have been correct enough; but in the view of the law he is chargeable with the intent which the transaction carries, by reason of the direct effects it tends to produce. *Potter v. McDowell* (1860) 31 Mo. 62; *Patten v. Casey* (1874) 57 Mo. 118.

As Mr. Terry, in making the purchase, acted on behalf of his firm, the latter is chargeable with the information he acquired in the course of the dealing, and with the intent which the rules of law presumptively ascribe thereto.

Nor does Mr. Terry or his firm occupy any better status by reason of an alleged want (on his part) of knowledge of the insolvency of the corporation, at the time the goods were purchased for the firm. If the goods were obtained, in part, for a consideration which is regarded in law as a nullity as to the corporation's creditors, the purchaser took upon himself the consequences of such a purchase. On the facts here disclosed, he took the risk of being called upon to make good the depletion of the corporate assets which his act caused. He certainly was aware that he was obtaining corporate property in exchange for a consideration which was of no benefit to the corporation. That knowledge is sufficient to authorize the inference that he intended the effects naturally flowing from the transaction. Nothing in this case has been shown which tends to explain or rebut that inference.

In *Mo. Lead, etc. Co. v. Reinhard* (1893) 114 Mo. 218 (21 S. W. Rep. 488), which plaintiffs rely upon in this connection, a sound price was paid for the property by the purchaser, which fact distinguishes that

case from the one at bar. The note of Chamberlain was no price at all for the corporation property, as against existing creditors in this case.

6. Attachment will catch property diverted (as appears here) from the reach of creditors of a corporation, so long as the property is in the hands of those chargeable in law (as above described) with a participation in the intent to hinder or delay those creditors. As to such creditors the transaction is voidable, at least, and within the provisions of the Missouri statute governing attachments in case of transfers to hinder or delay creditors. R. S. 1889, sec. 521.

7. Further, the plaintiffs insist that it was necessary for the defendant as sheriff to show the facts authorizing the issue of the attachment writs, and that without such showing the writs did not justify his possession, or support any judgment in his favor.

The trial on the circuit opened with an agreement by counsel (to dispense with formal proofs) to the following purport:

That at the time the action was brought, the defendant was in full possession of the property sued for, being the stock in dispute and itemized in the petition; that defendant was claiming rightful possession only by virtue of certain writs of attachment, written in due and usual form of such writs, issued out of the office of the clerk of the circuit court of Barry county, Missouri, for various amounts of indebtedness, in favor of the parties therein named from the Chamberlain Land and Mercantile Company, directed to him for service against said company; that under those writs of attachment the defendant took the goods in question from the possession and storehouse of plaintiffs in the town of Exeter; that after the suits were brought, pursuant to an order of delivery, the coroner of Barry county

took the property from the defendant and delivered it to the plaintiffs, and plaintiffs are now in possession; that the value of the property was $7,560 when this action was brought; that the writs of attachment, under which the goods were taken, were eight in number, for various sums, in favor of various plaintiffs in the attachment suits, as appears by the writs of attachment, amounting to $7,526.28. (The above is substantially a copy of the agreement.)

We regard this assignment of error as untenable, scarcely requiring a passing comment. It is true that the general sufficiency of the defense was questioned in the trial court by plaintiffs' request for a peremptory declaration to find for the plaintiffs; but the specific objection that a proper foundation had not been shown for the attachment levies (under which alone the defendant as sheriff asserted a right to possession) was not disclosed in any way at the trial. Without proper and valid attachments in force (or at least one such) the sheriff would have had no standing whatever to question plaintiffs' claim. The agreement of counsel above quoted should, we think (in the circumstances exhibited by this record) be fairly and reasonably considered to imply that the attachments were regular, and were founded upon grounds that raised the issues which both parties by their evidence proceeded to try.

Parties are usually held bound on appeal by the positions they have taken in the trial court. *Bensieck v. Cook* (1892) 110 Mo. 173 (19 S. W. Rep. 642).

Unless the agreement of counsel was intended to be taken and construed as above indicated, a great mass of evidence, drawn out by the examination of various witnesses introduced on plaintiffs' own behalf, as well as of those offered by the defendant, was wholly irrele-

vant.    We think that the objection to the judgment, on the ground mentioned, is not now maintainable.    It should, at least, have been more specifically placed before the trial court to warrant giving any weight to it on appeal.    R. S. 1889, sec. 2302.

8.    Plaintiffs next argue that, as the purchase they made was of an entire lot of merchandise, the finding and judgment could not correctly be given to them for a portion of the goods only, while the value of the residue was adjudged to defendant.

In view of the rules of law already announced in this opinion, it is clear that plaintiffs could not maintain their replevin for all the goods.    If, therefore, they must recover necessarily all or none, the judgment is simply erroneous in their favor, on their own reasoning.

A party to an action, under our code, can not successfully ask for a reversal of judgment because of an error which was not prejudicial to his substantial rights, however greatly the result may appear to him to lack the perfect symmetry which should characterize the performances of courts of law.    R. S. 1889, sec. 2250.

It is therefore needless to inquire whether there was error in allowing plaintiffs to recover any part of the goods of the Exeter store, since defendant has taken no appeal and acquiesces in the judgment, while plaintiffs could not obtain a reversal of it for the error (if there was one) in their favor.

The judgment is affirmed.  BRACE, C. J., and MAC-FARLANE, J., concur.    Judge ROBINSON, having tried the case as circuit judge, does not take part in the judgment here.